Ross S. KRAEMER, Plaintiff,

v.

FRANKLIN AND MARSHALL
COLLEGE, Defendant.

Civil Action No. 95–0020.

United States District Court,
E.D. Pennsylvania.

July 9, 1996.

Carol A. Mager and Joel C. Schochet, Mager, Liebengerg & White, Philadelphia, PA, for Plaintiff.

Christopher W. Mattson and Jennifer Craighead, Barley, Snyder, Senft & Cohen, Lancaster, PA, for Defendant.

### MEMORANDUM AND ORDER

HUYETT, District Judge.

On November 21, 1995, a jury found defendant Franklin & Marshall College ("F & M") liable for age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621–634 (1996) ("ADEA") after a six day trial and nine hours of deliberation. In answering the Jury Interrogatories submitted to them by the court, the jury calculated an award of $73,456.00 for back pay and $60,000.00 for front pay in the event that the court found instatement not feasible. The court must now determine whether to award plaintiff Ross S. Kraemer "(Kraemer") instatement or front pay as compensation for future damages.

For the reasons stated in the accompanying Memorandum, the court finds that instatement of Kraemer to the tenure track position in the Department of Religious Studies at F & M is not feasible. Therefore, the civil judgment order entered in this action on November 28, 1995 will be amended to include an award of $60,000.00 for future damages.

In addition, Kraemer has moved to amend the judgment to include liquidated damages

and for prejudgment interest on the award of back pay. For the reasons stated in the accompanying Memorandum, Kraemer's motion to amend the judgment to include liquidated damages is denied and Kraemer's motion for prejudgment interest on the award of back pay is granted.

## I. BACKGROUND

In September 1993, F & M advertised for a tenure track position in Biblical Studies in the Department of Religious Studies beginning in the Fall 1994. At the time of the search, the Department of Religious Studies was comprised of three tenured or tenure track faculty members, Joel Martin, Annette Aronowicz and Thomas Hopkins, who was chairman of the department. F & M received approximately 200 applications for the tenure track position in Biblical Studies, including the applications of Stephen Cooper (age 37) and Kraemer (age 47).

Professors Martin, Aronowicz, and Hopkins each reviewed the applications and eventually selected his or her top four candidates to be interviewed on campus. The three professors discussed their choices and unanimously agreed on a list of four candidates: Stephen Cooper, Ted Pulcini, Amy Wordelman and Ross Kraemer. After further interviews, Cooper and Kraemer were the two semi-finalists. It was undisputed that both Cooper and Kraemer were qualified for the position. The members of the Department voted two to one to select Stephen Cooper for the position, rather than Kraemer, with Professors Martin and Aronowicz voting for Cooper and Professor Hopkins voting for Kraemer. In accordance with the F & M's requirements, Professor Hopkins informed Dean Susanne Woods of the vote. Dean Woods ordered an affirmative action review because a younger, less experienced man had been chosen over an older, more experienced woman. Dean Woods also conducted an investigation of her own by speaking with all three faculty members of the Department of Religious Studies. Ultimately, Dean Woods concluded that the department had legitimate, nondiscriminatory reasons for selecting Cooper rather than Kraemer and she offered

the tenure track position in Biblical Studies to Cooper.

Upon learning that the tenure track position was offered to Cooper, Professor Hopkins sent a letter of resignation as chairman of the Department of Religious Studies citing objections to the process by which Cooper was selected and inappropriate considerations of age and sex by Professors Martin and Aronowicz. Professor Hopkins stated that Professor Martin selected Cooper because he did not "want to be the youngest person in the department" and Professor Aronowicz selected Cooper because she disagreed with Kraemer's feminist-based methodology of religious history.

Kraemer filed this action against F & M alleging age discrimination in violation of the ADEA, sex discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), as amended, and age and sex discrimination in violation of the Pennsylvania Human Relations Act, 43 Pa.C.S.A. § 951–963 (1996).

## II. DISCUSSION

### A. INSTATEMENT OR FRONT PAY

Although reinstatement/instatement ("instatement") is the preferred remedy to avoid future lost earnings, the United States Court of Appeals for the Third Circuit has recognized that instatement may not be feasible in all cases. See Squires v. Bonser, 54 F.3d 168, 173 & n. 8 (3d Cir.1995); Maxfield v. Sinclair Int'l, 766 F.2d 788, 796 (3d Cir.1985), cert. denied, 474 U.S. 1057, 106 S.Ct. 796, 88 L.Ed.2d 773 (1986); Ellis v. Ringgold Sch. Dist., 832 F.2d 27, 30 (3d Cir.1987), appeal after remand, 877 F.2d 54 (3d Cir.1989), cert. denied, 494 U.S. 1005, 110 S.Ct. 1298, 108 L.Ed.2d 475 (1990). Instatement is not feasible if the relationship between the parties has been so damaged by animosity as to make instatement impractical or if there is no position available in which to instate the plaintiff at the time of the judgment. See Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1103 (3d Cir.1995); Maxfield, 766 F.2d at 796.[1] The exact position which the successful plaintiff was unlawfully denied or removed from need not be

---

1. F & M does not contend that hostility between the parties precludes instatement of Kraemer.

available for instatement to be feasible, but a substantially comparable position must be available for the court to order instatement. *See Sinclair v. Insurance Co. of North America,* 609 F.Supp. 397, 400 (E.D.Pa.1984) (court awarded reinstatement to successful ADEA plaintiff where defendant agreed to reinstate plaintiff in the event of an adverse verdict to a comparable position for which plaintiff is qualified and plaintiff stated he would accept reinstatement to comparable position), *aff'd,* 782 F.2d 1029 (3d Cir.1986). If instatement is not feasible, the court should award the alternative remedy of front pay. *Berndt v. Kaiser Aluminum & Chem. Sales, Inc.,* 604 F.Supp. 962, 966 (E.D.Pa. 1985). In determining whether to grant instatement, the court should take into consideration the ADEA's purpose to make victims of discrimination whole by restoring them to the economic position they would have occupied but for the unlawful conduct of their employer. *See Starceski,* 54 F.3d at 1103; *Maxfield,* 766 F.2d at 796. The decision to grant reinstatement or its alternative, front pay, is within the discretion of the district court. *See Maxfield,* 766 F.2d at 796 ("Since reinstatement is an equitable remedy it is the district court that should decide whether reinstatement is feasible.").

Kraemer argues that instatement is the proper remedy in this case and that there are several ways F & M can instate her. First, Kraemer argues that she can fill the tenure-track position vacated by Professor Hopkins when he retires at the end of the 1995–1996 academic year and F & M can either use visiting professors or add an additional tenure-track position in the Department of Religious Studies if it desires to continue to offer courses in Asian Studies and Asian religions, which she is admittedly not qualified to teach. Second, Kraemer argues that F & M can choose not to renew Cooper's one year contract which expires on June 30, 1996 and replace him by instating her. Kraemer states that even if replacing Cooper with herself were characterized as "bumping" an incumbent to instate the victim of discrimination, such action has been held to be an appropriate remedy. According to Kraemer, the court need only order that she be instated to a tenure-track position in the Department of Religious Studies and allow F & M to determine which option it will utilize.

F & M contends that instatement is not appropriate because there is no position available in which to instate Kraemer at F & M. In support of this contention, F & M argues, first, that it should not be required to "bump" or fire Cooper, an innocent third party, to instate Kraemer. Second, F & M argues that it should not be required to create a fifth tenure track position in the Department of Religious Studies which it would be required to do by instating Kraemer and continuing to offer courses on Asian Studies and Asian religions. Lastly, F & M acknowledges that Professor Hopkins is retiring at the end of the 1995–1996 academic year thereby making a tenure track position available in the Department of Religious Studies. However, F & M argues that since Professor Hopkins taught courses on Asian Studies and Asian religions, his position is not comparable to the Biblical Studies position sought by Kraemer. Thus, F & M argues that instatement is not feasible and that the alternative remedy of front pay is appropriate.

### 1. *Bumping Cooper To Instate Kraemer Is Not Appropriate*

█ F & M should not be required to bump Cooper, an innocent third party, to instate Kraemer. Although the Third Circuit has not specifically addressed the issue of "bumping" innocent employees to reinstate or instate the successful plaintiff in discrimination cases, the courts in this circuit have followed the principle that reinstatement is not feasible if the exact position or no comparable position is available. *See Starceski,* 54 F.3d at 1103 (affirming district court's denial of plaintiff's motion for reinstatement reasoning that reinstatement was not feasible due to the lack of available positions and given the animosity between the parties); *Zampino v. Supermarkets Gen. Corp.,* 821 F.Supp. 1067 (E.D.Pa.1993) (recognizing that although reinstatement was the preferred remedy in discrimination cases, reinstatement is not feasible where there are no comparable positions available). Neither the *Starceski* court nor the *Zampino* court required the

defendant to bump an innocent employee to reinstate the plaintiff.

Other circuit courts agree that instatement is not an appropriate remedy if it requires bumping or displacing an innocent employee in favor of the plaintiff who would have held the job but for illegal discrimination. *See Spagnuolo v. Whirlpool Corp.*, 717 F.2d 114, 119–122 (4th Cir.1983) (although district court initially entered a judgment in accordance with the "rightful place" theory whereby the employee who suffered past discrimination will be given full seniority rights and permitted to obtain the next available vacancy by means of that seniority, district court erred in amending that judgement to require the defendant corporation to bump the innocent incumbent who held the position originally in dispute so that plaintiff could be reinstated);[2] *Ray v. Iuka Special Mun. Separate Sch. Dist.*, 51 F.3d 1246, 1254 (5th Cir.1995) (district court did not abuse its discretion in denying reinstatement where there were no existing vacancies in school district and where reinstating plaintiff would require displacement of an existing employee); *Deloach v. Delchamps, Inc.*, 897 F.2d 815, 822–23 (5th Cir.1990) (applying ADEA precedent to interpret the Louisiana Age Discrimination in Employment Act, court upheld district court's order that reinstatement was not feasible because plaintiff had been replaced and reinstatement would disrupt the employment of others); *Shore v. Federal Express Corp.*, 777 F.2d 1155, 1157–59 (6th Cir. 1985) (affirming district court's order that reinstatement of successful Title VII plaintiff was not feasible because reinstatement of plaintiff would displace the person who had held the position since plaintiff's termination and there were no comparable positions available); *EEOC v. Century Broadcasting Corp.*, 957 F.2d 1446, 1463 (7th Cir.1992) (denial of reinstatement of radio announcers terminated in violation of ADEA was properly based upon one strong and solid reason; there were a limited number of announcing positions at the radio station and each position was filled at the time and granting reinstatement to even one announcer would have required defendant to displace a currently employed announcer); *Graefenhain v. Pabst Brewing Co.*, 870 F.2d 1198, 1208–09 (7th Cir.1989) (in ADEA case, reinstatement is properly denied and front pay awarded where the employee's position exists but is not available because someone else currently occupies the employee's former position).

Generally, the courts which ordered or upheld reinstatement despite the fact that reinstatement would result in bumping an innocent employee determined that a balance of the equities warranted such action. *See Walters v. City of Atlanta*, 803 F.2d 1135, 1149 (11th Cir.1986) (" 'Bumping' is an extraordinary remedy to be used sparingly and only when a careful balancing of the equities indicates that absent 'bumping,' plaintiff's relief will be unjustly inadequate."); *Lander v. Lujan*, 888 F.2d 153, 155 (D.C.Cir.1989) (only after carefully balancing the equities did the district court determine that absent bumping the plaintiff's relief would be unjustly inadequate).

In balancing the equities, one often cited justification for ordering or upholding bumping an innocent employee is that the employer was on notice of past discrimination against a plaintiff or that a plaintiff had a substantial claim to a vacant position, but nevertheless filled the position, or that the employer exhibited other bad faith behavior. *See Brewer v. Muscle Shoals Bd. of Educ.*, 790 F.2d 1515, 1522–23 (11th Cir.1986) (approving bumping remedy after school board breached predetermination settlement agreement requiring it to appoint black applicant to the next available administrative position for which he was qualified by transferring other administrative personnel to the next available positions in lieu of appointing the applicant); *Reeves v. Claiborne County Bd. of Educ.*, 828 F.2d 1096, 1101–02 (5th Cir. 1987) (where district court denied reinstatement because defendant had hired a successor to plaintiff's position who would be bumped, appellate court reversed noting that

---

**2.** The *Spagnuolo* court nevertheless held that the district court could order the removal of a "new" incumbent employee from a position that became available *after* the original court order so that the plaintiff could be instated in the position he should have been given. The *Spagnuolo* court reasoned that the employee who is promoted or hired after the judicial pronouncement of discrimination is presumed not to be an innocent employee.

successor to plaintiff's position was hired just two months before trial and that "if the existence of a replacement constituted a complete defense against reinstatement, then reinstatement could be effectively blocked in every case merely by hiring an innocent third party after the retaliatory purpose was achieved."). Another factor considered in balancing the equities is an employer's willful, intentional or repeated discrimination. *See Lander*, 888 F.2d at 155–58 (district court may order bumping of innocent incumbent as a remedy for Title VII violations against plaintiff/federal employee who was demoted from top administrative position in retaliation for circulating memorandum criticizing Department of Interior's affirmative action plan; Department created new top administrative position and subordinate administrative position and hired incumbent to top position and plaintiff to subordinate position for express purpose of ousting plaintiff from top administrative position). Another factor courts weigh in balancing the equities is the ability to minimize the harm to the bumped employee. *See Brewer*, 790 F.2d at 1523 (bumped employee can be returned to the position held before she was transferred into position in which plaintiff is reinstated); *Lander*, 888 F.2d at 157 (displaced incumbent presumably can be reassigned within civil service system).

None of the aforementioned common justifications for ordering reinstatement or instatement despite the fact that it results in displacement of an existing employee apply in this case. F & M has neither exhibited bad faith behavior such as defying settlement agreements or prior court orders regarding Kraemer's employment at F & M, nor has F & M been found to have repeatedly, willfully or maliciously discriminated against Kraemer on the basis of age. *See Jury Interrogatories*, ¶¶ 6, 8 (jury answered "no" to the questions whether F & M's actions in discriminating against Kraemer were done with malice or reckless indifference to her right to be free from intentional discrimination in employment, and whether F & M acted willfully in discriminating against Kraemer on the basis of age). In addition, due to the nature of F & M's organization, the harm to Cooper if he is bumped cannot be minimized. Cooper cannot be

moved to another comparable position within F & M because F & M does not need more than one faculty member to teach courses in Biblical Studies. In addition, Cooper is an innocent incumbent as he was awarded the tenure-track position of professor of Biblical Studies sought by Kraemer without any prior knowledge of the discriminatory actions of F & M. Moreover, Cooper accepted the tenure track position with the expectation of successive appointments until his attainment of tenure barring unsatisfactory performance. Like all professors at F & M, Cooper received a one-year contract upon his appointment. In accordance with established F & M policy, Cooper's one-year contract must be renewed annually unless he performs unsatisfactorily. *See* Trial Testimony of Susanne Woods; Trial Testimony of Richard Kneedler; Testimony of Thomas Hopkins. The continued reappointment of a tenure track professor barring unsatisfactory performance is implicit in the Faculty Handbook, the Professional Standards Committee Handbook, and the Policy Manual and is evidenced by the due process procedures which must be followed if a tenure track professor is denied reappointment. *See* The Faculty Handbook, Plaintiff Exhibit 10, at pp. 4–7, 53–54; Professional Standards Committee Handbook, Plaintiff's Exhibit 11, at p. 6–9; Policy Manual, Plaintiff Exhibit 12, at p. 6–9. No evidence was introduced to suggest that Cooper is performing unsatisfactorily.

The court recognizes the uniqueness of this employment opportunity to both Cooper and Kraemer. In balancing the equities in this case, however, the court must not forget the effect the court order will have on Cooper, the potentially bumped innocent employee, and that the court order may achieve justice for Kraemer but work a substantial injustice for Cooper. The court concludes, therefore, that a balance of the equities in this case weighs against displacing Cooper, an innocent third party, to instate Kraemer.

### 2. The Tenure Track Position Vacated By Professor Hopkins Is Not Comparable To The Tenure Track Position Sought By Kraemer

■ It is not feasible to instate Kraemer to the tenure-track position vacated by Pro-

fessor Hopkins because that position is not comparable to the Biblical Studies position originally sought by Kraemer. Professor Hopkins, who is retiring at the end of the 1995–1996 academic year, was the principal instructor of the interdisciplinary program of Asian Studies and also taught courses on Asian religions in the Department of Religious Studies. F & M has advertised for someone with expertise in Asian religions to replace Professor Hopkins. As evidenced by Kraemer's curriculum vitae and by Kraemer's own testimony, Kraemer is not qualified to teach courses on Asian religions or Asian Studies. Thus, Kraemer would have to be retrained to teach these courses. Clearly, this is not a realistic option. Moreover, the fact that Kraemer would have to be retrained to fill Professor Hopkins' former position strongly supports the argument that no comparable position is available in which to instate Kraemer. *See Zampino,* 821 F.Supp. at 1071 (the fact that plaintiff would have to be retrained to gain the expertise necessary to hold the position defendant is offering lends strong support to the argument that the two positions are not "essentially the same" as contended by defendant). It cannot be reasonably argued that the tenure track position in Biblical Studies which was sought by Kraemer and the tenure track position vacated by Professor Hopkins are comparable. Thus, although Professor Hopkins' retirement will create a vacant tenure track position in the Department of Religious Studies, it is not feasible to instate Kraemer to this position.

### 3. *Instating Kraemer Would Improperly Force F & M Either To Create A Fifth Tenure Track Position Or Cease Offering Courses In Asian Studies Or Asian Religions*

■ If Kraemer were instated to the tenure track position vacated by Professor Hopkins, F & M would be forced either to hire a fifth tenure track professor to teach courses on Asian religions and Asian Studies, or stop offering these courses. Forcing F & M to make either choice is unwarranted. The mere fact that F & M would have to create an additional tenure track position in the Department of Religious Studies to teach Asian religions and Asian Studies if it were required to instate Kraemer to Professor Hopkins' former tenure track position is ample evidence that no position is, in fact, available in which to instate Kraemer. Caselaw does not support requiring F & M to create a position to instate Kraemer when the alternative remedy of front pay is available. *See Maxfield,* 766 F.2d at 796 (instatement is not feasible when there is no position available at the time of the judgement in which to instate the plaintiff); *Starceski,* 54 F.3d at 1103 (reinstatement is not a viable option due to the lack of available positions).

Moreover, the evidence demonstrates that F & M does not need a fifth tenure track professor in the Department of Religious Studies. Richard Kneedler, the President of F & M, testified that the fiscal and programmatic needs of F & M do not warrant the creation of a fifth tenure track position in the Department of Religious Studies. *See* Trial Testimony of Richard Kneedler. In fact, Kneedler testified that he was opposed to creating a fourth tenure track position in the Department of Religious Studies because of the low student enrollment in religious studies courses and the need to create tenure track positions in other departments, but Dean Susanne Woods argued that a fourth tenure track position in the Department of Religious Studies was needed so that western Christian traditions and Christian bible courses could be taught. *See* Trial Testimony of Richard Kneedler; Trial Testimony of Susanne Woods.

Nor does the fact that F & M could decide to cease offering courses in Asian Studies or Asian religions, rather than create a fifth tenure track position, support instatement. Compelling F & M to make this choice would constitute an unwarranted intrusion by the judiciary into F & M's freedom to decide what courses it will offer or what programs deserve staffing. The intrusion would be magnified in this case because, in approving the new Biblical Studies position, which occurred before F & M discriminated against Kraemer, F & M specifically expressed a desire to maintain course offerings in Asian Studies. On March 12, 1993, the Educational Policy Committee ("EPC") of F & M ap-

proved the creation of a fourth tenure track position in the Department of Religious Studies. The EPC approval provided "[t]his tenure track position will be in Biblical Studies, at the department's request. The department will contribute at least five courses over two years to American Studies; will affirm its continuing commitment to participate regularly in Asian Studies; and will, it is hoped, participate regularly in Women's Studies." Summary of EPC Recommendations for New Positions, March 12, 1993, Plaintiff's Exhibit 8; Uncontested Fact No. 7. Kraemer argues that visiting professors could be hired to teach courses on Asian Studies or Asian religions. Despite F & M's wrongdoing, and the court's desire and obligation to make Kraemer whole, the court refuses to interfere with F & M's academic policies and decisions regarding which courses are taught and by whom.

Even if F & M were forced to create a fifth tenure track position or hire visiting professors to teach courses in Asian religions and Asian Studies so that Kraemer could be instated without having to bump Cooper, a situation would be created whereby Kraemer and Cooper are qualified to teach the same courses to a limited number of students. It is not practical for F & M to offer additional courses in Biblical Studies given the low enrollment in religion courses. Consequently, neither Kraemer nor Cooper would be able to maintain a regular full-time teaching load each year which is required to attain tenure. *See* The Faculty Handbook, at p. 6.

 In sum, although instatement is the preferred remedy, instatement is not feasible in this case. The alternative remedy of front pay will be awarded. Kraemer has not objected to the jury's calculation of front pay. In fact, Kraemer refuted F & M's contention that she waived her right to instatement because she did not object to the court's front pay instruction to the jury by stating that "it was clearly understood that the jury's front pay determination would be entered only if instatement were not awarded." *See* Plaintiff's Response to Defendant's Brief in Support of its Findings of Fact and Conclusions of Law, at p. 2. In addition, the jury's verdict regarding front pay should not

be disturbed unless the record is critically devoid of the minimal amount of evidence upon which the jury could have reached the verdict. *Feldman v. Philadelphia Housing Auth.*, 43 F.3d 823, 832–33 (3d Cir.1994). In response to F & M's motion in limine to limit front pay damages to a reasonable period of time not to exceed three years, and Kraemer's response, the court ordered that Kraemer may present evidence to show that she is entitled to front pay through her expected date of retirement. Order dated November 8, 1995. Presumably, all of this evidence was presented. The record adequately supports the jury award, and therefore, Kraemer will be awarded $60,000.00 in front pay.

### B. *AMENDMENT OF JUDGMENT TO INCLUDE LIQUIDATED DAMAGES*

 Although the jury found that F & M discriminated against Kraemer on the basis of age, the jury did not find that the discrimination was willful. *See* Jury Interrogatories, ¶ 8. In post trial motions, Kraemer moves pursuant to Rule 59(e) of the Federal Rules of Civil Procedure to amend the judgment to award her liquidated damages under the ADEA.

According to Kraemer, the United States Supreme Court has made clear that every violation of the ADEA is willful except those limited situations in which the defendant made an age-based decision but believed in good faith that such a decision was not prohibited by the statute. Kraemer argues that the instant case does not fit into this limited exception, and therefore, the age discrimination found by the jury necessarily must have been willful.

If discrimination is willful within the meaning of Section 7(b) of the ADEA, 29 U.S.C. § 626(b), the plaintiff is entitled to liquidated damages. In *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993), the United States Supreme Court reaffirmed its definition of "willful" as enunciated in *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 126, 105 S.Ct. 613, 624, 83 L.Ed.2d 523 (1985) and *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133, 108 S.Ct. 1677, 1681, 100 L.Ed.2d 115 (1988). The *Hazen Paper* Court held that a violation of

the ADEA is willful if the employer either "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA." *Hazen Paper Co.*, 507 U.S. at 614, 113 S.Ct. at 1708 (citing *Trans World Airlines, Inc.*, 469 U.S. at 126, 105 S.Ct. at 624; *McLaughlin*, 486 U.S. at 133, 108 S.Ct. at 1681). The *Hazen Paper* Court also reaffirmed its conclusion that by enacting the ADEA, Congress intended to create a "two-tiered liability scheme" under which some but not all ADEA violations would give rise to liquidated damages. *See Hazen Paper Co.*, 507 U.S. at 613–15, 113 S.Ct. at 1708. Thus, the Court rejected a broader definition of willful providing for liquidated damages whenever the employer knew that the ADEA was "in the picture" because it would practically obliterate any distinction between willful and nonwillful violations. *Id.* The Court stated that "[i]t is not true that an employer who knowingly relies on age in reaching its decision invariably commits a knowing or reckless violation of the ADEA." *Id.* at 616, 113 S.Ct. at 1709. The Court further stated that "[i]f an employer incorrectly but in good faith and nonrecklessly believes that the statute permits a particular age-based decision, then liquidated damages should not be imposed." *Id.*

Based on a review of the record, a jury acting reasonably could find that F & M did not act willfully or recklessly in discriminating against Kraemer because of her age. Accordingly, the jury's finding that F & M did not act willfully in discriminating against Kraemer on the basis of age is affirmed, and Kraemer's motion to amend the judgment to award her liquidated damages is denied.

### C. *PREJUDGMENT INTEREST ON AWARD OF BACK PAY*

Kraemer moves for prejudgment interest on the award of back pay. The jury awarded Kraemer $73,456.00 in back pay. Kraemer calculates prejudgment interest using the Internal Revenue Service overpayment rates set forth at 26 U.S.C. § 6621 for each quarter from July 1, 1994 (the beginning of the 1994–1995 academic year) to November 28, 1995 (the date the judgment was entered). Kraemer requests that interest be compounded quarterly. In response to Kraemer motion for prejudgment interest, F & M stated that it would defer to the court's discretion as to whether prejudgment interest is appropriate and whether the interest rates posed by Kraemer are correct. F & M only objects to Kraemer's request that interest compound quarterly. F & M contends that interest should be compounded annually rather than quarterly.

The decision to award prejudgment interest and the amount of interest awarded are within the trial court's discretion. *See Berndt v. Kaiser Aluminum & Chem. Sales, Inc.*, 629 F.Supp. 768, 770 (E.D.Pa.1985), *aff'd*, 789 F.2d 253 (3d Cir.1986). Because prejudgment interest reimburses the claimant for the loss of the use of his or her investment or funds from the time of the loss until judgment, the court concludes that an award of prejudgment interest is proper. Thus, the court awards Kraemer prejudgment interest using the statutory rates for overpayments set forth in 26 U.S.C. § 6621 that prevailed between July 1, 1994 and November 28, 1995. The interest will be compounded quarterly. *See Taylor v. Central Pennsylvania Drug and Alcohol Servs. Corp.*, 890 F.Supp. 360, 368–70 (M.D.Pa. 1995); *EEOC v. Reads, Inc.*, 759 F.Supp. 1150, 1162, n. 20 (E.D.Pa.1991) (awarding prejudgment interest on back pay in Title VII case using IRS rates and compounded quarterly).

### III. *CONCLUSION*

For the foregoing reasons, the civil judgment order entered in this action on November 28, 1995 is amended to include an award of $60,000.00 in front pay. Kraemer's motion for prejudgment interest on the award of back pay is **GRANTED** and the civil judgment order entered in this action on November 28, 1995 is amended to include an award of $4,467.37 in prejudgment interest. In addition, Kraemer's motion to amend the civil judgment order to include liquidated damages is **DENIED**.

488

## CALCULATION OF PREJUDGMENT INTEREST
## ON KRAEMER'S BACK PAY AWARD

| QUARTER | BACK PAY | IRS RATE | INTEREST | TOTAL |
|---|---|---|---|---|
| 7/1/94 to 9/30/94 | $16,403.00 | —— | —— | $16,403.00 |
| 10/1/94 to 12/31/94 | $16,403.00 | 8% | $ 328.06 | $33,134.06 |
| 1/1/95 to 3/31/95 | $16,403.00 | 8% | $ 662.68 | $50,199.74 |
| 4/1/95 to 6/30/95 | $16,403.00 | 9% | $1129.49 | $67,732.24 |
| 7/1/95 to 9/30/95 | $ 5,350.00 | 8% | $1354.64 | $74,436.88 |
| 10/1/95 to 11/28/95 | $ 2,503.00 | 8% | $ 992.49 | $77,932.37 |
| | | TOTAL | $4,467.37 | |